FILED

2015 Mar-30  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DEWAYNE CARROLL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:13-cv-00414-AKK** |
| **OFFICE DEPOT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

DeWayne Carroll, an African-American who suffers from a disability, claims that his former employer, Office Depot, Inc., discharged him because of his race and disability and in retaliation for complaining about the alleged discrimination, in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101 *et seq.* Doc. 1. The issues in this case center primarily on a new manager's decision to place Carroll on a "Performance Improvement Plan," or a "PIP." *See generally* docs. 29, 37, 40. Prior to working with this new manager, Carroll had worked with Office Depot for 18 years, primarily without any major performance issues. Doc. 28-2 at 30. When the new manager arrived, he transferred Carroll laterally to a different department—an

assignment Carroll hated—and purportedly started "nit-picking" Carroll's performance. *Id*. at 5, 10, 34. Ultimately, the new manager placed Carroll on a PIP that required Carroll, among other things, to submit an "action plan" and identify areas in which he needed additional training—which Carroll admitted he failed to do, in part because he did not feel his performance was deficient. Docs. 28-2 at 27-28; 35-5. Eventually, because of Carroll's purported failure to meet the metrics outlined in the PIP, Office Depot discharged Carroll based on the recommendation of the new manager. Docs. 28-10 at 21; 28-12 at 68.

Before the court is Office Depot's motion for summary judgment.[1] Doc. 27. Having reviewed the parties' arguments and the evidence submitted, with respect to the retaliation claims, based in part on the temporal proximity between Carroll's August 24, 2011 lawsuit in a different case and the PIP issued one week later on September 1, 2011 (which led to Carroll's discharge on January 18, 2012), the court concludes that a jury should decide whether retaliatory animus (rather than Carroll's failure to comply with the PIP) purportedly motivated the decision to discharge Carroll. Therefore, the motion for summary judgment on the retaliation claim is due to be denied**.** As to the race discrimination claims, for the reasons outlined below, the court concludes that summary judgment is proper.

---

[1] Carroll's Motion for Leave to File Excess Pages, doc. 36, is **GRANTED**.

# I. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*,

398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable

inferences must be drawn in the non-moving party's favor). However, "mere

conclusions and unsupported factual allegations are legally insufficient to defeat a

summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir.

2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560,

1563 (11th Cir. 1989)). Furthermore, "[a] mere 'scintilla' of evidence supporting

the opposing party's position will not suffice; there must be enough of a showing

that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573,

1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. FACTUAL BACKGROUND

Office Depot is a retail provider of office products and services. *See* doc. 28-

3 at 65. Carroll, an African-American who suffers from a vision impairment that

renders him legally blind, joined Office Depot in 1993 as a part-time stocker, and

worked for Office Depot until his termination on January 18, 2012. Doc. 28-2 at 3.

Carroll became a full-time employee in 1999, earned a promotion to department

manager six years later in 2005, and ultimately hoped to become an assistant

manager. *Id*. at 4, 18, 32. Between 2005 and 2010, Carroll asked Office Depot to

consider him for two assistant manager positions, but both times the company

selected other candidates, one of whom was a Caucasian male with no disability.

*Id*. at 6, 15-16. Because Carroll believed that discriminatory animus motivated the

selection decisions,[2] he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 25, 2010 alleging race and disability discrimination, and a lawsuit on August 24, 2011.[3] Docs. 35-1 at 2; 28-21 at 4-15.

In the meantime, Carroll continued working as a technology department manager. In April 2011, shortly before Carroll entered a twelve week period of family leave for the birth of his child, Office Depot hired a new store manager, Rodney Williams, who ultimately recommended Carroll's termination on January 18, 2012 due to performance and insubordination issues (which the court will describe more fully below). Docs. 28-2 at 21; 28-12 at 28, 68. The events that transpired once Williams became store manager culminated in Carroll filing this present action. The essence of Carroll's claim is that when he returned from family leave, Williams began "nit-picking" Carroll's performance and "setting Carroll up to fail . . . because of his race and disability." *See* doc. 37 at 44. As detailed below, Carroll describes certain events that he believes demonstrate Williams's discriminatory intent, and maintains that the disciplinary actions that Williams

---

[2] According to one of Carroll's former store managers, his district manager at some point articulated that he had concerns with Carroll becoming an assistant manager because of his eyesight. Doc. 35-23 at 5. Additionally, another store manager later told Carroll that Office Depot was never going to promote him because of his disability. Doc. 28-2 at 17.

[3] Carroll's first lawsuit also includes a claim for retaliation in violation of the Family and Medical Leave Act. Doc. 28-21 at 4-15.

initiated and that ultimately led to Carroll's discharge were unfair and discriminatory.

### A. *Discriminatory intent*

On April 12, 2011, just a few days after working with Carroll, Williams filled out a Manager's Record of Discussion form ("MRD") in which he summarized two incidences that day where Carroll mistakenly sold the wrong product to a customer and misquoted the price of a product to another customer. Doc. 35-18 at 3. In the MRD, Williams noted that Carroll "has a habit of holding everything he reads very close to his eyes" and that "both issues should have been avoided by thoroughly reading the labels" on the products. *Id*. While a manager typically completes an MRD after a verbal discussion with an employee about work performance to document the conversation, *see* doc. 28-12 at 16, Williams "did not confront" Carroll because he wanted to wait to speak with someone in higher management to "see if [they] were already aware of the disability," doc. 35-18 at 3. Carroll believes that Williams's mention of his vision impairment in this MRD demonstrates discriminatory animus. Doc. 37 at 43.

When Carroll returned from medical leave in July 2011, Carroll repeatedly had encounters with Williams which Carroll believes demonstrate discriminatory intent. For example, Williams transferred Carroll laterally with no loss in pay from the technology department to the supplies department. Doc. 28-2 at 5. Carroll

viewed the transfer as a less desirable assignment because he preferred the technology department. *Id*. According to Williams, he transferred Carroll because he believed Carroll's tenure with the company "made him flexible" and "capable of [managing] . . . any department," whereas Carroll's replacement in the technology department, Adam Price, was "brand new" and more comfortable with technology sales. Doc. 28-12 at 34. Carroll disagrees and contends that Price actually had very little technology experience, and that Williams's claim that Price was "more comfortable" with technology is therefore suspect. *See* doc. 37 at 44. Carroll believes instead that Office Depot hired Price because they wanted "to have somebody in place . . . when they . . . [got] rid of [Carroll]." Doc. 28-2 at 6.

Additionally, Carroll describes that Williams began assigning Carroll to more difficult overnight shifts, which kept Carroll from seeing his family,[4] and that Williams would "watch" him in a way that Carroll believed "singled" him out and made him feel "picked on." Doc. 28-2 at 10, 34. Carroll recounts one particular instance that he described as "just ridiculous" and that he "would probably never forget": During a night shift assignment, Williams told Carroll that he had "missed something" while "straightening the store." *Id*. at 34. Apparently, Williams took a photo of the item—a "little piece of cellophane, probably half an inch square round"—printed the image out, and drew a red circle around the cellophane to

---

[4] Williams explains he would sometimes "run overnight crews" to "fix the store" because "the store was a mess" and they "didn't have enough hours during the day." Doc. 38-12 at 45.

show Carroll. *Id*. Carroll and his coworker looked for the cellophane and could

only see it when Carroll "literally got down on [his] hands" and ran his hands

across the floor. *Id*. Carroll also describes another incident where Williams had a

"little smirk on his face" when he handed Carroll a document and asked him to

read it, stating "I know it's small, it's hard for you to see." *Id*. at 19.

### B. Disciplinary actions

Carroll also maintains that Williams subjected him to a series of unfair

disciplinary actions related to "new" performance standards without offering

proper training or counseling. *See* doc. 37 at 45. These disciplinary actions

occurred on July 15, 2011, August 1, 2011, August 15, 2011, August 16, 2011, and

August 17, 2011, when Williams spoke with Carroll and completed MRDs

regarding Carroll's failure to follow company procedures for "working the store

stock balancing reports" and for failing to close the store properly by leaving

products out and leaving trash in the store aisles. Doc. 28-13 at 14-24. Based on

these infractions, on September 1, 2011, Williams initiated a formal disciplinary

"write up," i.e., a PIP, which summarized the issues that Williams observed related

to the stock balancing reports and required that Carroll follow the proper

procedures or risk "further disciplinary action, up to and including termination of

employment." Doc. 35-5 at 2. As part of the PIP, Williams required Carroll to

submit an "action plan" by September 5, 2011 identifying the steps Carroll would

take toward improving his performance.[5] *Id.* Carroll admittedly failed to do so by the deadline and instead, one month later and after two discussions with Williams about the action plan, Carroll wrote a letter to Williams and Human Resources acknowledging that the "write [up] stated that [he] should do an action plan" but asserting, "I do not feel that I was wrong due to the way I was trained and because of these actions toward me. I feel that because I spoke with the U.S. Department of Labor[6] and my lawsuit against Office Depot that I am being retaliated against." Doc. 35-6 at 2; 35-28 at 2. In response, by letter dated on October 28, 2011, Williams informed Williams to submit an action plan within three days or risk "further disciplinary action, up to and including termination." Doc. 28-13 at 43.[7]

Two days after the deadline, Carroll submitted a letter which he titled, "Action Plan," that Williams apparently found unsatisfactory because, rather than outlining "the appropriate steps [Carroll would] take to improve the performance deficiencies noted in the PIP," doc. 28-13 at 47, Carroll admitted to the actions included in the PIP but stated that he did his job according to the way he was taught, and that "if there is a new procedure please train me or instruct me on the

---

[5] Whether to require an employee to complete an action plan to address a PIP is a matter that Office Depot leaves to the discretion of the manager. Doc. 28-10 at 19.

[6] The Department of Labor reference is presumably related to Carroll's October 2010 EEOC complaint in which he alleged race and disability discrimination in Office Depot's decision not to promote Carroll to assistant manager. *See* docs. 35-1 at 2; 28-21 at 4-15.

[7] According to the employee handbook, failure to complete an action plan when required by a manager is grounds for termination, as is a failure to follow instructions from a manager in general. Doc. 28-4 at 93, 96.

new procedure," doc. 35-7 at 2. As a result, on November 18, 2011, Williams

devised an action plan on Carroll's behalf and required that Carroll follow "the

steps necessary to improve" outlined in the action plan and to "complete a list of

areas in which training is needed." Doc. 28-13 at 47-48.

Carroll admittedly failed to comply with Williams's action plan because he

"didn't feel that [he] had done anything wrong . . . so why do an action plan," and

because he believed that at least one task was "basically undoable" due to Williams

setting a deadline during "Christmastime, which is a busy [time of] year for retail."

Doc. 28-2 at 27-28. Carroll also points out that the action plan included

performance issues that Williams failed to identify in the PIP relating to Carroll's

time management skills and failure to complete certain assigned tasks. *Id*. at 27.

Moreover, despite his belief that Williams should train him on the "new"

procedures, Carroll did not comply with the action plan mandate to "complete a list

of areas in which training is required," doc. 28-13 at 47-48, because Carroll

"[didn't] know what [areas] . . . he lacked [training] on," doc. 28-2 at 28.

Subsequently, Williams recommended to the human resources department

(specifically LaTonya Rampa and Bruce Hauberg) that Office Depot terminate

Carroll. Based on the information Williams provided, Rampa and Hauberg

discharged Carroll on January 18, 2012. Docs. 28-10 at 21; 28-12 at 68.

# III. ANALYSIS

Office Depot contends that Carroll cannot establish a *prima facie* case of discrimination, or, alternatively, that Office Depot's proffered reason for discharging Carroll was pretextual. The *prima facie* case argument is based on Carroll's failure to identify "a similarly situated individual who [Office Depot] treated more favorably" than Carroll. Doc. 29 at 23. Office Depot is correct that, generally, when a plaintiff attempts to prove a discrimination claim by circumstantial evidence, he must satisfy the *McDonnell Douglas* framework by showing that (1) he belongs to a protected group, (2) he was subjected to adverse job action, (3) his employer treated similarly situated employees outside his classification more favorably, and (4) he was qualified to do the job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). The only issue here is third element—i.e., whether Carroll's failure to identify a comparator employee "involved in or accused of the same or similar conduct" as Carroll but who Office Depot treated in a more favorable way, *see id.*,[8] dooms Carroll's discrimination claims, or whether,

---

[8] The court agrees with Office Depot that Carroll has not identified a similarly situated individual that Office Depot treated less favorably. Carroll asserts that Office Depot "admits that all department managers in the [E]astwood store since Carroll's termination . . . are Caucasian" and "Price, who replaced [Carroll as technology department manager], was not disabled [and is Caucasian]." Doc. 37 at 39. Carroll also points out that Williams never disciplined Price "despite his lying to Williams . . . [by saying] that he had completed his job duties when in fact he did not." *Id*. at 49. These contentions miss the mark because, to the extent Carroll is suggesting that Office Depot treated him less favorably than similarly situated employees by hiring a non-disabled Caucasian man to replace him or by employing Caucasian managers, the court notes that Carroll has failed to establish that Office Depot *did not discharge* Price or any other employee who was "involved in or accused of the same or similar conduct" as Carroll. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("In determining whether

as Carroll contends, he can survive Office Depot's motion even without identifying a comparator. Indeed, as Carroll points out, this Circuit has held that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case . . . [and] the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "where the plaintiff presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent—the essential element of a claim for discrimination—the plaintiff will always survive summary judgment." *Jones v. Water Works Bd. of the City of Birmingham*, No. 2:10-CV-1323-AKK, 2012 WL 2856651, at *10 (N.D. Ala. July 5, 2012) (citing *Lockheed-Martin*, 644 F.3d at 1328) (internal quotation marks omitted).

---

employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."). Alternatively, if Carroll is suggesting that Price's lying to Williams is the "same or similar" to Carroll's performance issues, this contention is insufficient because Carroll has presented no evidence to support this position. *See id.* (plaintiff must come forth with "sufficient affirmative evidence to establish that the non-minority employees with whom he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged"). While the record establishes that lying to a manager at Office Depot is "pretty serious," doc. 28-17 at 26, the record contains no evidence as to the context of the incidence of lying, the number of times it happened, deposition testimony from Williams as to how he handled the issue with Price, etc. Basically, Carroll has presented no affirmative evidence to enable the court to make the relevant comparison. *See  Spriggs v. Mercedes Benz USA*, LLC, No. CV 213-051, 2014 WL 4808852, at *13 (S.D. Ga. Sept. 26, 2014) (rejecting similar argument where record was "unclear . . . how [the] supervisors' handling" of plaintiff's situtaion was different from other employees).

In attempting to demonstrate such a "convincing mosaic of circumstantial evidence," Carroll maintains that "the totality of the circumstances shows sufficient circumstantial evidence from which a jury could infer [Office Depot] displayed a racially [and disability based] discriminatory animus toward [Carroll]." Doc. 37 at 41-42. Specifically, Carroll maintains that a jury could infer discrimination because (a) "a manager who was seeking to enforce new standards would make the standards clear and provide training to employees who were subject to them, which Williams did not do," *id*. at 45, and (b) Williams's actions toward Carroll demonstrate pretext for discrimination, *id*. at 41-48. The court addresses each contention in turn.

## A. Lack of training as an alleged "convincing mosaic of circumstantial evidence"

As this court stated in *Jones*, "a triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Jones*, 2012 WL 2856651, at *10 (citation and internal quotation marks omitted). In attempting to demonstrate such a "convincing mosaic of circumstantial evidence," Carroll maintains that "a jury could determine that a manager who was seeking to enforce new standards would make the standards clear and provide training to employees who were subject to them, which Williams did not do . . . . Yet, [Carroll] was disciplined . . . . [T]his is all evidence that Williams was setting

Carroll up to fail because of his race and disability." Doc. 37 at 45. Carroll's

reliance on *Jones* misses the mark because, rather than establishing the necessary

convincing mosaic from which a jury could infer discrimination, the evidence that

Carroll relies on, at best, establishes that Office Depot acted unfairly by

discharging Carroll despite Williams's failure to properly counsel or train Carroll

regarding the "new standards" which Williams purportedly implemented and

which Carroll admittedly failed to follow. *See id*. However, anti-discrimination

laws do not prohibit employers from treating employees unfairly. *See Alvarez v.

Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1267 (11th Cir. 2010) (employee's

"burden is to show not just that [the employer's] proffered reasons for firing her

were ill-founded but that unlawful discrimination was the true reason") (citation

omitted); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.

1984) (noting that an employer's "stated legitimate reason . . . does not have to be

a reason that the judge or jurors would act on or approve" and concluding that

employer's reason was not based on discriminatory animus even though the reason

"might seem unfair . . . to the outside observer") (citation omitted). In that respect,

even accepting that Williams implemented "new standards" (although no record

evidence supports this assertion), evidence that an employer did not adequately

train an employee is not the sort of conduct that demonstrates the convincing

mosaic for a jury to infer that race or disability animus motivated the decision to discharge that employee.

### B. Alleged pretextual reasons for discharge

As further evidence of the convincing mosaic, Carroll argues that Office Depot's proffered reason for his discharge is pretextual. Doc. 37 at 47. *See also Jones*, 2012 WL 2856651, at *10 (citing *Evans v. McClain of Ga., Inc.,* 131 F.3d 957, 963 (11th Cir.1997)) (finding jury could infer discriminatory intent where the employer's human resources records "painted two distinct pictures" based on the record as to the reason for plaintiff's termination, suggesting that employer's proffered reason was pretextual). Basically, Carroll takes issue with Office Depot's claim that it discharged Carroll for the performance issues summarized in the September 1, 2011 PIP and corresponding action plan, and asks this court to infer that "Williams fabricated the alleged performance deficiencies against Carroll" for the following reasons: (1) Williams mentioned Carroll's disability in the April 12, 2011 MRD for reasons "unrelated to the underlying MRD"; (2) Williams "transferred and demoted" Carroll to the technology department; (3) the MRDs were in written form and Carroll never saw them or knew about them; and (4) the supplies department was "in a state of disarray," and Williams transferring Carroll to supplies and then "nit-picking his performance" was Williams's way of "setting Carroll up to fail." Doc. 37 at 43-45. The court addresses these contentions

sequentially below, and as explained below, declines to make the inference Carroll requests because the facts belie Carroll's contentions.

First, the contention that Williams mentioned Carroll's disability in the April 2011 MRD for reasons "unrelated to the underlying MRD" is inconsistent with the text of the MRD itself, which includes Williams's observation that the incidences—Carroll misquoting the price of a product to a customer and selling the wrong product to another customer—"should have been avoided by thoroughly reading the labels," as well as Williams's opinion that Carroll's error may have been due to Carroll's vision impairment based on several employees telling Williams that Carroll was legally blind. However, Williams pointed out that he had no knowledge of the accuracy of the reports, and that he was "wait[ing] until he could partner with [Rampa] . . . to see . . . if she [was] aware of a disability." Doc. 35-19 at 3. Second, notwithstanding Carroll's "preference" for the technology department, it is undisputed that Carroll was not "demoted" to supplies department manager. In fact, Carroll admitted that the reassignment was a lateral move with the same compensation and status. *See* doc. 28-2 at 5. Third, while Carroll may not have seen the actual MRDs at issue in paper form, this fact does not establish pretext because the primary purpose of an MRD is to document a verbal discussion a manager had with an employee, and the employee typically does not see the MRD. *See* doc. 28-12 at 16. Moreover, Carroll admitted to the various

performance deficiencies included in the September 1, 2011 PIP, which summarized some of the information in the MRDs. *See* doc. 28-2 at 82, 86. In other words, Carroll has failed to establish that the failure to see the MRDs impacted him adversely.

Finally, it is clear to the court that the crux of Carroll's discrimination claim is based on his belief that he performed his work exceptionally. Indeed, the court has no doubt that Carroll did his job according to "the way [he] was taught," and that he did so successfully under prior managers. *See id*. at 86. Carroll's beliefs, however, are irrelevant on the pretext inquiry. As the Eleventh Circuit aptly put it:

> [T]he fact [an employee] thinks more highly of [his] performance than [his] employer does is beside the point. The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head . . . The question is whether [his] employers were dissatisfied with [him] for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints . . . as cover for discriminat[ion].

*Alvarez*, 610 F.3d at 1266. Relevant here, Carroll admittedly failed to do his job according to his then-manager Williams's standards, or comply with the action plan through which Williams explained his expectations and offered training. *See id*. at 27-28. While Carroll genuinely believes that Williams "set him up" to fail by sending him to a department that was in disarray, unfortunately for Carroll, there is nothing in the record to support his contention that race or disability animus

motivated the transfer, or any of the actions Williams initiated.[9] *See id; see also*

*Nix*, 738 F.2d at 1187.

Contrary to Carroll's contentions, this case simply does not fit into the

parameters outlined by the *Lockheed-Martin* court to excuse the failure to identify

a similarly situated employee. *See Lockheed-Martin*, 644 F.3d at 1328. Ultimately,

while Carroll is correct that the court must draw all reasonable inferences in his

favor, *see Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011), the court cannot

ignore the undisputed record evidence here that Carroll failed to meet several

requirements related to the PIP, including multiple deadlines for submitting an

---

[9] To the extent Carroll argues that the fact that his replacement in the technology department, Adam Price, had little experience in technology sales establishes that Williams's reason for transferring Carroll to supplies is pretextual, *see* doc. 37 at 44, the court notes that this fact, even if true, does not contradict Williams's explanation that Price was "more comfortable" with technology than supplies, doc. 28-12 at 34, because being "more comfortable" in one department is not synonymous with being more "experienced" in that department.

Along those lines, Carroll maintains that Office Depot changed its explanation for why it transferred Carroll to the supplies department. Specifically, in its June 22, 2012 letter to the EEOC, Office Depot explains that "the supplies area of the store was suffering at the time and Mr. Williams decided to transfer Mr. Carroll to supervise the supplies area of the store because of his expertise at Office Depot, and with the hope that Mr. Carroll could turn it around." Doc. 35-20 at 12. Carroll maintains that this explanation is inconsistent with Williams's deposition testimony that "one of the reasons" he transferred Carroll was that Price was "brand new" and more comfortable with technology sales, whereas Carroll's tenure with the company made him capable of managing any department. Doc. 28-12 at 33-34.

The court disagrees with Carroll's contention that these explanations are contradictory because both the June 22, 2012 letter and Williams's testimony point to Carroll's experience and expertise with company as part of the reason for his transfer, and the letter does not include any statement contradicting Williams's account of Price's level of comfort with technology sales. Doc. 28-12 at 33-34; 35-20 at 12. Furthermore, to the extent Carroll is arguing that Williams did not actually hope that Carroll could "turn around" the supplies department, the court notes that Williams stated plainly in his deposition that he did in fact hope that that Carroll could "turn it around." Doc. 28-12 at 133. As such, Carroll's contention that Office Depot's statements to the EEOC are "false" is not supported by the record.

Significantly, as it relates to Carroll's discharge, Office Depot's June 22, 2012 letter to the EEOC is in relevant part consistent with and contains the same information as the September 1, 2011 PIP. *See* doc. 35-5 at 2; 35-20 at 5-8. Specifically, the PIP describes three instances where, according to Williams, Carroll failed to "follow the proper procedure related to . . . store stock balancing reports." Doc. 35-5 at 2. Consistent with the PIP, Office Depot's letter to the EEOC recounts these incidences relating to stock balancing reports, and explains that Williams issued Carroll a PIP and action plan, and that Carroll failed to develop an action plan or comply with the action plan that Williams devised (all of which is undisputed). Doc. 35-20 at 5-8.

action plan—which alone is grounds for termination under Office Depot's policies, *see* doc. 28-4 at 93, 96.[10] Moreover, even when a plaintiff makes a *prima facie* case, to survive summary judgment, the plaintiff must present "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against [him]." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715 (1983)). Based on a careful review of the record, which from a discrimination standpoint, contains no evidence of  "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Office Depot's articulated reason for discharging Carroll,[11] the court concludes that Carroll has not established "the

---

[10] Carroll contends that one task on the action plan was "undoable" because "Christmastime . . . is a busy [time of] year for retail." Doc. 28-2 at 27-28. The court rejects this argument because "so far as discrimination law is concerned, [an employer] is within [his] rights . . . to set unreasonable or even impossible standards, as long as she did not apply them in a discriminatory manner." *Alvarez*, 610 F.3d at 1267.

Along the same lines, the fact that Williams did not discharge Price for lying about completing tasks does not establish pretext because Carroll has not presented evidence that Price's insubordination was "under similar circumstances." Specifically, while the Eleventh Circuit in *Alvarez* recognized that an employer applying the same standard in a discriminatory manner—i.e., by disciplining a person of a particular race but not disciplining persons outside of that race—can be evidence of pretext, the court in *Alvarez* looked for evidence as to whether the employer acted for the "same reason." *Id.* Similarly, the Eleventh Circuit in *Addison v. Ingles Markets, Inc.*, 515 F. App'x 840, 843 (11th Cir. 2013), looked to evidence of whether all employees violating the exact same policy were fired indiscriminately.

Here, the record establishes at best that Price at least once lied to Williams about completing a task, and lying (according to a different manager, Jamin Laney) is a "pretty serious" offense. Doc. 28-17 at 26-29. (At some point after the lying incident, Price transferred to a different store and no longer worked under Williams's supervision. *Id.*) Perhaps the comparison is partly valid if both Carroll and Price did not complete a task per Williams's standards. Even assuming this, the court finds the evidence insufficient to establish that Williams treated Price and Carroll differently because Carroll has presented no evidence that Price's failure to follow Williams's standards justified a PIP and action plan, that Price failed to complete an action multiple times, that Price failed to follow an action plan that Williams devised—and then, after all of this, was not discharged.

[11] As an apparent inconsistency, Carroll takes issue with the fact that Office Depot apparently sent a different version of the November 18, 2011 letter (in which Williams explained that Carroll had not submitted a satisfactory action plan and provided the action plan that Williams devised) and claims that the differences in the

pretextual nature—i.e., potential falsity—of each proffered justification for [his] discharge." *Alvarez*, 610 F.3d at 1265; *Jones*, 2012 WL 2856651, at *10. Therefore, Carroll's failure to identify a comparator employee dooms Carroll's *prima facie* case of discriminatory discharge, and the court will accordingly grant summary judgment on Carroll's discrimination claims. *See Jones*, 2012 WL 2856651, at *10.

## IV. CONCLUSION

For the reasons stated above, Office Depot's motion for summary judgment is due to be granted with respect to the discrimination claims and denied with respect to the retaliation claims. The court will enter a separate order consistent with this opinion.

**DONE** the 30th day of March, 2015.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

letters "speak for themselves" and establish pretext. Doc. 35-27 at 2; 35-28 at 2, doc. 37 at 49-40. To this effect, Carroll points out that, in the letter that Williams gave to Carroll, Carroll's "request for training is acknowledged" and "Williams also commits to follow up with Carroll on a regular basis" regarding the plan, whereas the letter "which was submitted to the EEOC neither acknowledges the request for training nor states that Williams will meet with Carroll to follow up with him." Doc. 37 at 39-40. The court initially notes that the letter to the EEOC in fact acknowledges Carroll's request for training explicitly by stating that the action plan includes steps "necessary to improve . . . that are directly relate[d] to the PIP as well as the concerns you expressed regarding training." Doc. 35-27. Furthermore, while the letter sent to the EEOC does not state that Williams would follow up with Carroll on a regular basis, the court is not convinced that this omission has much significance since following up is seemingly inherent to the process of issuing a PIP and action plan and the action plan itself includes a listed follow-up date for each of the items in the plan. *See* doc. 28-4 at 141. Ultimately, while it is unclear from the record why Office Depot sent a different letter to the EEOC, the two letters are not substantively inconsistent as to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Office Depot's proffered reason for discharging Carroll. *See Alvarez*, 610 F.3d at 1265.